---

(76 Misc. Rep. 120.)

### In re CUNNINGHAM'S WILL.

(Surrogate's Court, New York County. March, 1912.)

CHARITIES (§ 21*)—CHARITABLE BEQUEST—INDEFINITENESS OF BENEFICIARIES.
    Under Personal Property Law (Consol. Laws 1909, c. 41), as amended by Laws 1909, c. 144, providing that no gift to charitable uses shall be deemed invalid by reason of the indefiniteness of the persons designated as beneficiaries, a bequest to trustees to be applied in their discretion to such charitable associations and institutions of learning as the trustees select is valid.

    [Ed. Note.—For other cases, see Charities, Cent. Dig. §§ 44–50; Dec. Dig. § 21.*]

In the matter of the construction of the will of Daniel Cunningham. Decree rendered.

Affirmed, 135 N. Y. Supp. 1107.

Thomas F. Gilroy, Jr., for petitioners.
Thomas Carmody, Atty. Gen., for the State.
Noble, Jackson, Estabrook & Hubbard, Robert L. Wensley, and John Thomas Smith, for contestants.
Daniel J. Mooney, special guardian.

FOWLER, S.  The will in this matter being duly proved and entitled to probate, the surrogate is required to sit as a court of construction; the validity and construction of a disposition contained in the will being at issue.  Code Civ. Proc. § 2624;  Matter of Davis, 45 Misc. Rep. 554, 92 N. Y. Supp. 968;  Id., 105 App. Div. 221, 93 N. Y. Supp. 1004;  Id., 182 N. Y. 475, 75 N. E. 530.

The sole contested issue presents the validity of the will of the late Daniel Cunningham, or of the second clause thereof, dated 25 January, 1907, as follows:

"Second. I give and bequeath to my said executors and trustees, hereinafter named, the sum of fifty thousand dollars to be by them applied in their best judgment and discretion to such charitable and benevolent associations and institutions of learning for the general uses and purposes of such associations and institutions as my said executors may select, and in such sums respectively as they may deem proper."

The eleventh clause of the will nominated the Rev. Louis J. Sloane and Daniel F. Mahoney to be "the executors and trustees of this my last will and testament."

The testator died on October 8, 1911, and his will takes effect as of that date.  It is apparent that there are nominated trustees and some expression of a trust purpose in the will of Mr. Cunningham.

If the second bequest in Mr. Cunningham's will is to be supported at all, it will be as a charitable use or trust.  The supreme test of a charitable use is that it is public and for indefinite beneficiaries, personæ incertæ.  If for definite persons, it is not a charitable use.  It is singular that at this late day in so old and so prosperous a commonwealth as this, the law of charities should be in any respect unsettled.  The reason is not far to seek.  Prior to independence the law of England relating to charities was a part of the law of New York, and it was continued as a part of the fundamental law of the state of New York by constitutional reservation.  State Const. 1777, § 35;  Consts. 1821, 1846;  Williams v. Williams, 8 N. Y. 525, 541.  The decision in Williams v. Williams, after some disfavor and even dishonor, contains now the prevailing doctrine.  Allen v. Stevens, 161 N. Y. 141, 55 N. E. 568.  In 1777, even in England, the jurisdiction of the Chancellor over charitable uses and the right of the Attorney General to enforce indefinite uses or trusts were attributed to the statute of charitable uses, or else they were occasionally deemed dependent on it.  St. 43 Eliz. c. 4;  Atty. Gen. v. Bowyer, 3 Ves. 726.  That the statute of Elizabeth was extended to, or in force in, New York in the colonial epoch, there is abundant evidence.  If so, it became in substance part of the fundamental law of the state, adopted by the first state Constitution.  But, when the English statutes extending here were either revised and re-enacted or else abrogated in the year 1788, the statute of charitable uses was not re-enacted, and it was consequently abrogated.  Laws 1788, c. 46.  If the Chancellor's jurisdiction and the right of the Attorney General to enforce charitable uses for indefinite persons depended wholly on the statute of Elizabeth, as some contended (Baptist Ass'n v. Hart's Ex'rs, 4 Wheat. 1, 4 L. Ed. 499;  Atty. Gen. v. Bowyer, 3 Ves. 726) after the year

1788, the law of charities in New York was in a very bad state. The discussions on this particular point occupied some years, it being finally held that the Chancellor had a jurisdiction over charities independently of the Elizabethan Statute of Charitable Uses. Coggeshall v. Pelton, 7 Johns. Ch. 292; Potter v. Chapin, 6 Paige, 649; McCartee v. Orphan Asylum Soc., 9 Cow. 437, 18 Am. Dec. 516; Kniskern v. Lutheran Churches, 1 Sandf. Ch. 439, 562; Vidal v. Girard's Ex'rs, 2 How. 127, 196, 11 L. Ed. 205; Yates v. Yates, 9 Barb. 336; Williams v. Williams, 8 N. Y. 525; Incorporated So. v. Richards, 1 Dr. & W. 258; 1 Con. & L. 58; 4 Ir. Eq. 177; San. & Sc. 559. This was the only rational conclusion, as both charities and the laws of England certainly existed prior to the time of Elizabeth. Everything in England did not begin with the legal renaissance in the time of Henry VIII. In fact, little then began.

But, when this point was reached, there was unfortunately much uncertainty still left concerning the extent of the independent and ancient jurisdiction of the Court of Chancery, and concerning the common-law power of the Attorney General to invoke the jurisdiction of Chancery in favor of an indefinite charitable use. Wheeler v. Smith, 9 How. 55, 13 L. Ed. 44; Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80; Bascom. v. Albertson, 34 N. Y. 584, 592. After the New York Revised Statutes of 1830 abolishing all uses and trusts except four, known as "express trusts" (1 R. S. p. 728, § 55), there began in this state a series of litigations over charities which lasted for more than 40 years. It would have been quite competent to hold that public and charitable trusts were not affected by the Revised Statutes. But the courts did not so hold. It is not an instructive picture which such contentions to the contrary present to the reader; indeed, these litigations furnish one of the most melancholy, if brilliant, pages in the judicial history of this state, and their total net result was the loss to the poor people of this state of many most important charitable foundations which would have been in the future of inestimable and permanent value to them. In the course of these litigations, the opinion on the original questions concerning the extent of the chancellor's jurisdiction over charities and the inherent common-law powers of the Attorney General to enforce them fluctuated and were finally lost sight of in the face of a major contention, viz.: Did the Revised Statutes of 1830 abolish all charitable uses and trusts? Such an effect of the Revised Statutes was finally settled in the affirmative, although meanwhile the doubts on the great historical questions had subsided, and the sufficiency of chancery jurisdiction and the common-law powers of the Attorney General, independently of the statute 43 Elizabeth (chapter 4), had been confirmed. Ould v. Washington Hospital, 95 U. S. 303, 309, 24 L. Ed. 450; People v. Ingersoll, 58 N. Y. 1, 14, 15, 17 Am. Rep. 178; Holland v. Alcock, 108 N. Y. 328, 16 N. E. 305, 2 Am. St. Rep. 420; Allen v. Stevens, 161 N. Y. 138, 55 N. E. 568; Incorporated So. v. Richards, 1 Dr. & W. 248; 1 Con. & L. 58; 4 Ir. Eq. Rep. 177.

When it was at last finally held that the Revised Statutes tolerated no express trusts or power in trust, unless they complied with the

article of the Revised Statutes regulating uses and trusts, it followed that no charitable trust was valid in this state unless there was (1) a definite and certain beneficiary; (2) a use and trust sufficiently worked out by the settlor to be capable of enforcement; (3) a limitation in trust, valid under the rules governing perpetuities. This, for the time being, put an end in this state to charitable uses. The authorities on these points are so familiar as to need no citation. The result was that in New York all schemes for permanent charitable relief for the benefit of the poor or other indefinite objects had thenceforth to take the form of gifts, grants, bequests, or devises to charitable corporations, authorized to take and hold on such trusts, or else of gifts to individual trustees to convey to such corporations to be formed within a time permitted by the rule against perpetuities. Before these rules were fully established much litigation and confusion existed in this state on the subject of charitable donations, bequests, and devises, with increasing loss to the cause of charity.

This very brief outline of the condition of the law of charities in New York up to the year 1893 will serve to show that it was too inelastic and not nicely adjusted to the well-being of the people of the state. In 1893 the Legislature undertook to better it by chapter 701, Laws of 1893, entitled, "An act to regulate gifts for charitable purposes." The act was not remote in purpose from the Elizabethan statute of charitable uses (St. 43 Eliz. c. 4). Like that statute, the act of 1893 is largely, although not entirely, the basis of the existing law of charities. The act (chapter 701, Laws of 1893), in so far as it relates to this will is now contained in section 12 of the Personal Property Law (Laws 1909, c. 45, as amended by Laws 1909, c. 144). By this act:

"No gift, grant or bequest to religious, educational, charitable or benevolent uses shall be deemed invalid by reason of the indefiniteness or uncertainty of the persons designated as the beneficiaries thereunder in the instrument creating the same."

The act provides especially for a case where no trustee is named, and it (as now amended) provides for a general and very comprehensive jurisdiction over such trusts, and for their enforcement by the Attorney General. Its purpose is remedial, and in aid of charitable gifts, grants, bequests, and devises for uncertain persons—personæ incertæ. The act of 1893 was, however, clearly defective on its face in not expressly relieving charitable uses from the operations of the then established rule, subjecting such gifts to the statutes regulating perpetuities. But in the leading case of Allen v. Stevens, 161 N. Y. 123, 55 N. E. 568, not without a very strong dissent (for during the litigation six judges were against and six for the conclusion), the Court of Appeals finally held that the object of the act was apparent, that it intended to restore the ancient law touching charitable uses, and they say in effect to relieve it also from the operation of the established rule against perpetuities. Thus by one imperfectly drawn legislative act the ancient law of charities, touching uncertainty and permanence, in so far as it existed independently of the statute of charitable uses (St. 43 Eliz. c. 4), is now reconstituted in this state.

It is, however, to be understood that the act of 1893, any more than the Elizabethan statute, does not tolerate an unlawful suspension of the time within which a charity may vest in possession. A charitable use may now be perpetual, but it must vest within the rule against perpetuities, otherwise a charity might be made to begin or take effect a thousand years hence. It cannot be denied that the act of 1893 (as since amended and construed) is very capable of beneficent results; and it tends to put again the law of this state in line with the law of other states on a like subject.

The present law regulating charitable gifts may be characterized by two attributes or characteristics, indefiniteness and perpetuity. It regulates something as indefinite as the poor or charity, and as perpetual as time itself. There remain, however, at the present time two great doctrines of the old law of charities, still quantitatively uncertain in this state, viz., the extent of the application of that great maxim of construction, "Charities are favored," and of that other doctrine of courts of equity known as cy pres. The apparent inclination and tendency of the courts and the substantive law is to restore both to their former significance in the law governing charitable trusts. In St. John v. Andrews Institute, 117 App. Div. 714, 102 N. Y. Supp. 808; Id., 191 N. Y. 254, 83 N. E. 981, 14 Ann. Cas. 708, it was said distinctly, "The policy of the law favors upholding charitable bequests," although for a long time prior to the act of 1893 this had been in substance denied in this state. Matter of Prime, 136 N. Y. 347, 32 N. E. 1091, 18 L. R. A. 713. The latest amendment to this statute under consideration, however, contains an express authority for the application of the doctrine of judicial cy pres. Laws of 1909, c. 144. Thus the present policy of the law to favor charities is unmistakable. Bowman v. Domestic & Foreign Miss. Soc., 182 N. Y. 498, 75 N. E. 535; Allen v. Stevens, 161 N. Y. 123, 142, 55 N. E. 568. If the new legislation revives the old law of charities, as since authoritatively stated, there seems to be no good reason for longer banishing or excluding either the doctrine of judicial cy pres or the great maxim of construction favoring charities, as both are complementary constituents of the ancient law of charity.

The act of 1893 and its present expressions on the statute book, already noticed, aid gifts, devises, and bequests to certain specific uses, denominated "religious, educational, charitable or benevolent." Unless a bequest is to one or other of these uses, it is not aided by the acts "to regulate gifts for charitable uses" and its several re-enactments and amendments (Matter of Shattuck, 193 N. Y. 446, 86 N. E. 455), and it is subject to the general articles of the statutes regulating uses and trusts in this state.

There is and always has been a certain ambiguity about the term, "charitable uses." A use since the statute of uses primarily denotes a passive trust, converted by the statute of uses into a legal estate. But the older meaning and significance of the term "use" survives in the term "charitable use," which now means, and has always meant, a charitable trust. It is well known that charitable uses are never executed in possession by the statute of uses. This is a fact very im-

portant in the law of charities and one never to be lost sight of. The term "use" then in connection with the limiting word "charitable" is a term of art. What was meant by the terms "religious," "educational," and "benevolent" uses, as first employed in the statute of 1893, is another question. A benevolent use may mean in law something larger than a charitable use, while religious and educational uses may be charitable or otherwise.

We come now in the light of the foregoing to the consideration of the subject of limitations of public or charitable uses and trusts at the present time. When are such trusts well limited by devise or bequest of charitable persons, and when are they defective beyond judicial cognizance? This bequest of Mr. Cunningham turns wholly upon such a consideration. If a charitable donor's limitation of his gift is inartificial or defective in substance, the power of the court, possessed of an established equitable jurisdiction to aid the general charitable purpose, is restricted by defined boundaries, expressed in the recent statutes before cited or in the fundamental law of the state. Such power is not plenary in every respect. Otherwise it would be so arbitrary as to be contrary to the genius of our fundamental institutions as expressed in the constitutions of government.

The jurisdiction of the present courts possessed of equitable powers are subject to definite limitations. Only the judicial powers of the Lord Chancellor of England were transferred to the former chancellor of this state upon our independence of the crown, and from the chancellor such powers only devolved upon the courts now vested with a general equitable jurisdiction in this state. Such powers over charities as had accrued to the crown as parens patriæ or general controller of charities, and were exercised by the crown by appointment under the king's own sign manual, never belonged to the Lord Chancellor ex virtute officii, and consequently never devolved on the chancellor of this state or his judicial successors. It is unnecessary to offer citations upon such familiar and elementary propositions. That all the governmental powers of the crown were sub modo invested in the corporate state of New York, upon the subversion of the monarchy, is also an elementary proposition. That it would be open to the corporate state, by its organic agent, the Legislature, to exercise over charities the powers formerly exercised by appointment under the king's sign manual, is no longer an open question. Mormon Church v. United States, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 478; Griffin v. Graham, 8 N. C. 96, 9 Am. Dec. 619. But, until the Legislature acts in the premises, it is apparent that the inherent powers of courts possessed of equitable jurisdiction to supply defects in bequests and devises to charitable purposes are limited, and the limitations are to be found either in those decisions of England binding on us by constitutional reservation (Manning v. Manning, 1 Johns. Ch. 527, 531), or else in those decisions of our own tribunals rendered since independence.

It was a point perfectly well established by the old law once in force here that, where a bequest was given to charity generally and indefinitely without trustees or objects selected, the king was the

constitutional trustee; and that he acted if at all by virtue of an appointment under the sign manual. Ommanney v. Butcher, T. & R. 270; Cary v. Abbot, 7 Ves. 490. We may throw out of consideration, therefore, all such defective bequests as were remedied by the action of the crown, and consider when it was that equity had an independent power to supply defects in bequests to general charitable uses, for we may be sure that this is the present primary measure of equitable jurisdiction over defective charitable uses and trusts. If such jurisdiction has been since augmented, it is by virtue of the recent acts of this state to regulate charitable gifts. These are very enlarging and powerful acts, and to be given great attention in the future development of the law of charities.

It has been stated in the last preceding paragraph that the present equitable jurisdiction of the courts does not embrace that power over charities which accrued to the crown as parens patriæ. What, then, is the excluded jurisdiction in question? It was perfectly well settled that it was only in cases where money was given to charity generally and indefinitely, without trustees named or objects selected, that the king was the constitutional trustee. It was not the generality of the trust purpose alone which occasioned the caducary succession of the crown in such cases, but the omission by the settlor to invest the discretion over the execution of the trust in nominees. Baylis v. Atty. Gen., 2 Atk. 239; Atty. Gen. v. Berryman, 1 Dick. 168; Paice v. Archbishop of Canterbury, 14 Ves. 364, 372. If the succession in such cases had accrued to the crown solely by reason of the indefiniteness of the trust purpose, every testamentary appointment to the poor at large, or generally to charity, would have lapsed to it. But the growing judicial tendency at an early date was to confine such lapses to the crown to cases where the power of administering the general charity was not confided to nominees of the settlor's own selection.

In this case it is apparent that Mr. Cunningham contemplated a charitable trust, and he did more—he appointed trustees for the uses contemplated. Therefore one element of equitable jurisdiction over charities, the intention to create a trust and an appointment of trustees, is present. The defect in his will, if there be any, lies in a defective expression of the trust purpose. There is also present in the bequest before us a very evident intention on the part of Mr. Cunningham to deprive his heirs at law and next of kin of the sum of $50,000 out of his general estate, and to segregate it for charitable purposes. It would be manifestly a great pity if an intention so obvious is to be frustrated simply by reason of a defective expression of the trust purpose, for that is all there is in the contention against the trust. If the expression of the trust purpose, though charitable, is so ambiguous as to defeat interpretation, it must fail notwithstanding the recent legislation.

This contention then concerns the sufficiency of the expression of the trust purpose in Mr. Cunningham's will. Those who stand for its invalidity rest largely, if not entirely, on the decision of the Court of Appeals in Matter of Shattuck, 193 N. Y. 446, 86 N. E. 455. This

decision, it is claimed or argued to me, is decisive of the invalidity of Mr. Cunningham's will; but this is denied by Mr. Attorney General and the other counsel upholding the will. It will be noticed that the first case cited by the Court of Appeals in the opinion in the Shattuck Case is the well-known decision of Sir William Grant and Lord Eldon in Morice v. Bishop of Durham, 9 Ves. 399, 10 Id. 522. There testatrix bequeathed to her executors personal estate upon trust "to dispose of the ultimate residue to such objects of benevolence and liberality as the Bishop of Durham in his own discretion should most approve of." The gift failed on two grounds: First, because, while benevolence and charity might include charitable purposes, they might include other purposes not then classed as charitable; and, secondly, because the expression of the trust purpose was too indefinite to be executed by the court. It was a grave question whether the bequest was a charitable use at all. A like opinion was reached in a subsequent case (James v. Allen, 3 Mer. 17), where the expression employed was "benevolent purposes," and the court took occasion to say that it was not merely the addition of the word liberality in the Bishop of Durham's Case that rendered the trust uncertain. In other words, they hold that a benevolent purpose did not necessarily fall within the uses then termed "charitable." But in the case of Jemmit v. Verrill, Ambler, 585n, where the residue was given to trustees to dispose of the same for "such charitable and benevolent purposes" as one of them should direct, the trust was upheld, probably on the ground that the word benevolent was tautologous or that the gift was in reality conjunctive and therefore to charitable uses; for benevolent uses may be of the genus "charitable" and in such case it was a mere redundancy of expression. Hill v. Burns, 2 Dow. & Clark, 101. In Legge v. Asgill, Turn. & Russ. 265n, money was given to an executrix "that it might be given in charity," and the trust was upheld by both Sir John Leach, V. C., and Lord Eldon. There are other decisions to the same effect in the English books, yet of some authority in this government. Lord Langdale, M. R., in Kendall v. Granger, 5 Beav. 300, regarded a bequest for the relief of domestic distress, and assisting indigent and deserving individuals, as a charitable use. But since Lord Romilly's Act (St. 52 Geo. III, c. 101), the modern English decisions by reason of modern English legislation are not helpful here. The only English decisions of present import are those which are decisions of questions arising under a law of charities, once common to both states, England and New York. Such decisions remain argumentatively of some consequence.

The present act (Pers. Prop. Law, § 12) has not relieved the subject of charities from all difficulties. The pleonastic use of the words "religious, educational and benevolent uses" in conjunction with charitable uses is confusing rather than clarifying to the law of charities. Williams v. Kershaw, referred to in Baker v. Sutton, 1 Keen, 232; Ellis v. Selby, 1 Myl. & Craig, 298; James v. Allen, 3 Mer. 17; Matter of Shattuck, 193 N. Y. 454, 86 N. E. 455. Some religious and educational uses are not public uses. The employment in the act of 1893 of the legal term, "charitable uses," only would, since the

abrogation of the statutes against superstitious uses in this state, probably have been comprehensive enough to include with all former charitable uses all such religious or pious uses as were public. Charitable uses standing alone in the act would, since the repeal of the statute of charitable uses (St. 43 Eliz. c. 4), have denoted all those uses which were public or charitable uses before the statute of charitable uses (St. 43 Eliz.), and probably including pious or religious uses. See Magill v. Brown, 16 Fed. Cas. 429, and note on page 437, for a list of public or charitable uses. But this particular point need not be discussed at length in this case, as the will of Mr. Cunningham mentioned only uses within the act of 1893 "to regulate gifts for charitable purposes."

As the will of Mr. Cunningham does employ only the words now authorized by the existing statute—charitable and benevolent—no ambiguity should for that reason be imported into the will itself, but some effect, consistent with statutory intention, should be given these terms, if possible. What is now charitable is also benevolent. It was not formerly so. James v. Allen, 3 Mer. 17. Prior to the act of 1893 to regulate gifts for charitable purposes, it was well settled in this state after the year 1830 that no trust, charitable or private, could be supported unless the trust purpose was so clearly defined by the settlor himself, as to enable the court to give effect to it by decree. Owens v. Missionary So. of M. E. Church, 14 N. Y. 406, 67 Am. Dec. 160; Bascom v. Albertson, 34 N. Y. 592; Prichard v. Thompson, 95 N. Y. 76, 47 Am. Rep. 9. To maintain that a limitation of a charitable trust, defective after 1830 and before 1893 under this canon of construction just noticed, remains still defective since the act of 1893, would be to forget the effect of the practical abrogation of charitable uses in this state between those years. It would beg the whole question as to the effect of the recent legislation in this state. The question now is, What bequests and devises to charity are sufficient in expression either by the common law or under the acts "to regulate gifts for charitable purposes"? We have seen that at common law (which includes equity under the decision of Manning v. Manning, supra) there were decisions which would uphold Mr. Cunningham's bequest. If charity is the main purpose of a bequest, and the mode of its execution only is vaguely or defectively expressed, the trust should not be allowed to fail since the recent acts to regulate gifts for charitable purposes, if it is possible to avoid a result so detrimental to the public. Manley v. Fiske, 66 Misc. Rep. 388, 123 N. Y. Supp. 129; Id., 139 App. Div. 665, 124 N. Y. Supp. 149; Id., 201 N. Y. 546, 95 N. E. 1133. As I stated before in substance, those acts confide to the courts a greater express power than was ever committed to the Lord Chancellor or his successor in this jurisdiction. The intention of the acts should be respected.

As I read the opinion in Matter of Shattuck, 193 N. Y. 446, 86 N. E. 455, the decision is not decisive of Mr. Cunningham's will. The trust fund in Matter of Shattuck was given to trustees to apply to educational and religious uses. No mention was there made of charitable uses. It was held expressly in Shattuck's Case that the gift

there under consideration was not generally void by reason of the wide discretion of the trustees, or because the term "religious use" was not generically a public use, but because the gift as there expressed to religious uses required greater certainty than was contained in that particular will and bcause the words, "educational use," as employed in that will, did not necessarily imply a public or charitable use, but permitted the trustees, if they chose, to apply the funds to private or nonpublic uses. Rothschild v. Schiff, 188 N. Y. 327, 80 N. E. 1030. The part of the decision referring to educational uses proceeded on the ground laid down in Morice v. Bishop of Durham (before noticed). The vice apparent in the Bishop of Durham's Case was an incurable ambiguity. Down v. Worrall, 1 My. & K. 561. This principle there laid down was followed in Matter of Seymour, 67 Misc. Rep. 347, 124 N. Y. Supp. 637; Matter of Compton, 72 Misc. Rep. 289, 292, 131 N. Y. Supp. 183.

Obviously there is apparent also in the decision In re Shattuck a tendency to distinguish religious uses from public, educational, charitable, and benevolent uses, and the court wisely will not undertake to supply a defect in so polemical a matter as the limitation of a religious use. This point was not novel (Matter of Scott, 31 Misc. Rep. 85, 87, 64 N. Y. Supp. 577), and it has been followed in Matter of Compton, 72 N. Y. 294, 131 N. Y. Supp. 183. The decision in Re Shattuck indicates, perhaps, the unwisdom of coupling religious uses with charitable uses in an "act to regulate gifts for charitable purposes," a point before touched on in this opinion. There is a decided difference in historical development and in modern law between a religious use and a charitable use, and such difference is both fundamental and ineradicable. As the cases on religious uses present themselves, the courts, er natura rerum, will be compelled to take notice of the inherent differences only indicated here. There are some religious uses which may be included in charitable uses, while other religious uses may be regarded as polemical and in no sense charitable uses. The decision in Matter of Shattuck discloses that limitations of religious uses which are noncharitable in kind must henceforth be very precisely framed or they will not have the benefit of the recent legislation in and of charitable and religious uses; and also that bequests or other limitations for charitable uses must not be so equivocal as to include, necessarily, uses, noncharitable or private. It was the rule before Matter of Shattuck that an indefinite bequest to religious uses would not be executed cy pres. O'Hara's Wigram on Extrinsic Evidence, 412; 2 Redf. Wills, c. 5, and cases cited. It was also the rule before Matter of Shattuck that a charitable trust partly public and partly private was void for ambiguity, and could not be supported as a public or charitable trust. Ommanney v. Butcher, Turner & R. 260. Thus nothing really new was decided by Matter of Shattuck.

The question on Mr. Cunningham's will is addressed to one point: Does the bequest include by necessary implication uses of a noncharitable kind? I do not think so. Only one of the positions laid down in Matter of Shattuck has any present application to this point, as

there is no bequest at all in Mr. Cunningham's will for religious uses. The only other point of that opinion applicable here has been again considered in Matter of Robinson, 203 N. Y. 380, 96 N. E. 925, and it seems to me in a light very favorable to Mr. Cunningham's will. Matter of Shattuck and Matter of Robinson must be read together in the future.

Mr. Cunningham's will, as it has been stated above, gives the sum of $50,000 to trustees "to be by them applied in their best judgment and discretion to such *charitable and benevolent associations and institutions of learning* for the general uses and purposes of such associations and institutions as my said executors may select, and in such sums as they may deem proper." In Shattuck's will there was no specific bequest to charitable uses. Here there is evident a charitable purpose, and that purpose pervades and dominates the entire bequest. That a private purpose or use is contemplated can only be reached by construction. Where two constructions are possible, that which most accords with the manifest intention and makes for validity must be accorded. A charitable use is necessarily a public use only, and the instant a court of competent jurisdiction holds that the use intended by Mr. Cunningham is charitable only the trustees of the use are precluded from selecting any use not charitable or public, and they are liable for a breach of trust if they misapply the fund to any private or noncharitable purposes. The official construction removes ipso facto all ambiguity from the limitation. The use is charitable only, and the trustees of the trusts are obligated accordingly. This effect is precisely that designed by the act of 1893 "to regulate charitable gifts," as now amended. After a use in trustees is judicially declared public or charitable, it is then for Mr. Attorney General to see to it that there is no misapplication on the part of the trustees of the charitable "use." The court is not embarrassed here by an indefinite expression of a limitation of a religious use as it was in Matter of Shattuck. It was in Shattuck's Case dealing with uses of three kinds—religious, educational, and charitable. While some religious and educational uses are charitable, others are not so, as has long been pointed out in the law dealing with charities. In other words, the terms are not convertible. But that is not the case of Mr. Cunningham's will.

That the bequest now under consideration is susceptible, under the proper rules of interpretation of charitable bequests, of any other construction than that laid down in Matter of Robinson, I cannot believe. The designation of several charitable objects and purposes by a conjunctive copula brings Mr. Cunningham's will within the realm of charitable uses, and, that fixed purpose of testator being arrived at, must be held to dominate the entire limitation. The determination of the purpose as charitable by the use of the copula removes all ambiguity from the balance of the limitation. The limitation is as if it read, "to such charitable associations and to such benevolent associations and institutions of learning as are charitable." Such was the doctrine really announced, in substance, I think, in Matter of Robinson. Had Mr. Cunningham's limitation been in the disjunctive, to

such charitable or benevolent institutions of learning, as his trustees selected, it would have been within the mischief noticed and condemned in Re Shattuck. But Mr. Cunningham's limitation is not in the disjunctive, and the fact that it denotes charitable and something more is not inconsistent with its denoting charitable only. The purposes prescribed by the testator are charitable, benevolent, and educational, not charitable or benevolent or educational. As expressed, the benevolent and educational purposes should be held to be charitable, and therefore public. This is the whole case on Mr. Cunningham's will. It is an established principle of legal interpretation of wills that the general shall include the particular: "semper specialia generalibus insunt." Matter of Robinson, 203 N. Y. 386, 96 N. E. 925. In Mr. Cunningham's will the general purpose is charitable and the particular purposes are benevolent and educational institutions which, being coupled with charitable, are of necessity also charitable. That is to say, testator's presumed intention is to be inferred from the governing word charitable, and his subsequent inclusion of other particulars, perhaps not charitable if standing alone, is subordinated to the lawful and laudable purpose clearly expressed by the word charitable. This principle of interpretation is, I think, not remote from that governing an enumeration of particulars after a general bequest, which I had lately to consider in a very inconsiderable case. Matter of Morrisey, 72 Misc. Rep. 575, 576, 131 N. Y. Supp. 986.

There is no difficulty in formulating a decree to enforce Mr. Cunningham's bequest to charitable purposes. If the trustees should fail to appoint under Mr. Cunningham's will, the court will resolve a scheme and appoint for them under the recent statutes in aid of charities, and quite independently of doctrines of judicial cy pres, which would in any event be adequate. A public charity given by devise or bequest need never fail again in this state if Mr. Attorney General invoke, as he will do, the appropriate remedy.

The decree will provide that the second bequest of Mr. Cunningham's will is a valid testamentary disposition under the laws of this state.

Decreed accordingly.